1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9   DEGLA GROUP FOR INVESTMENTS,      )   CASE NO. CV 09-05278 MMM (AGRx)
    INC.,                            )
10                                   )
              Plaintiff,             )   FINDINGS OF FACT AND
11                                   )   CONCLUSIONS OF LAW
         vs.                         )
12                                   )
    BOCONCEPT USA, Inc., d/b/a        )
13  BOCONCEPT FRANCHISE; CLUB 8       )
    FRANCHISE INC., d/b/a BOCONCEPT   )
14  FRANCHISE; BOCONCEPT NORTH        )
    AMERICA, INC.; BOND SAFEGUARD     )
15  INSURANCE COMPANY; KIM            )
    MOELHOLM, individually, CARSTEN   )
16  PEDERSEN, individually, VIGGO     )
    MOELHOLM, individually, MARK      )
17  ARENSBERG, individually,          )
                                     )
18            Defendants.            )
                                     )
19  _____  )
                                     )
20  BOCONCEPT FRANCHISE, INC., A      )
    Kansas Corporation,               )
21                                   )
              Counterclaimant,        )
22                                   )
         vs.                         )
23                                   )
    DEGLA GROUP FOR INVESTMENTS,      )
24  INC., a California corporation; HUSSEIN )
    H. SIDKY, an individual; HASAN H. )
25  SIDKY, an individual; HASSAN M.   )
    MORSHEDY, an individual; and      )
26  MOHAMED HASSAN MAHMOUD            )
    MORSHEDY, an individual,          )
27                                   )
              Counterdefendants.      )
28  _____  )

On July 20, 2009, Degla Group for Investments, Inc. ("Degla") filed this action against BoConcept Franchise ("BoConcept"), Bond Safeguard Insurance Company, Kim Moelholm ("Moelholm"), Carsten Pedersen, Viggo Moelholm ("Viggo Moelholm"), and Mark Arensberg.[1] The complaint alleged that Degla had opened a retail furniture store under a franchise agreement with BoConcept, which BoConcept had unlawfully terminated.   It alleged claims for various violations of California's franchise investment laws; unlawful termination of a franchise; unfair trade practices under California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200; fraudulent inducement; breach of contract; breach of the covenant of good faith and fair dealing; and declaratory relief.

On July 24, 2009, BoConcept filed a counterclaim against Degla and Degla shareholders and managers Hussein Sidky ("Sidky"), Hasan Sidky ("Hasan Sidky"), and Hassan M. Morshedy.[2]   The counterclaim alleged causes of action for breach of contract, fraud, declaratory relief, and a permanent injunction.[3]   On August 25, 2009, the court granted BoConcept's motion for a preliminary injunction; it enjoined counterdefendants from holding themselves out as BoConcept franchisees and from using, *inter alia*, BoConcept's trademarks, business methods, or confidential information in their business operations.[4]

On October 15, 2009, the court granted in part and denied in part counterdefendants' motion to dismiss the counterclaim, dismissing BoConcept's breach of contract and fraud claims without prejudice.[5]   On November 10, 2009, BoConcept filed a first amended counterclaim, stating causes of action against counterdefendants for declaratory relief, permanent injunction,

---

[1]Complaint, Docket No. 1 (July 20, 2009).

[2]Counterclaim, Docket No. 10 (July 24, 2009).

[3]*Id.*

[4]Order Granting Motion for Preliminary Injunction, Docket No. 43 (Aug. 25, 2009).

[5]Order Granting in Part and Denying in Part Motion to Dismiss Certain Relief in Counterclaim, Docket No. 68 (Oct. 15, 2009).

breach of contract, unfair business practices under the UCL, trademark infringement, and fraud.[6] On September 30, 2010, the court granted in part and denied in part counterdefendants' motion to dismiss the first amended counterclaim, dismissing BoConcept's unfair competition and trademark infringement claims without prejudice.[7]  BoConcept did not file a second amended counterclaim.  Its first amended counterclaim – with claims for declaratory relief, permanent injunction, breach of contract, and fraud that survived dismissal – remained the operative pleading.

On May 6, 2011, the court granted a motion to withdraw filed by counsel for Degla and the Sidkys[8]  The court directed Degla and the Sidkys to have an attorney file a notice of appearance no later than June 6, 2011.[9]  It warned the Sidkys that if no notice of appearance was filed by that date, they would be substituted *pro se*; it cautioned Degla that because it was a corporation, it could not represent itself, and that, if no notice of appearance was filed by the deadline, the court would strike its answer and enter its default.[10]  No notice of appearance was filed for either Degla or the Sidkys.  On June 20, 2011, the court struck Degla's answer to the counterclaim and entered its default with respect to that pleading.[11]

On August 3, 2011, the court granted defendants' *ex parte* application to dismiss Degla's complaint pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.[12]  The Sidkys were substituted *pro se*.  On August 29, 2011, Ahmed Elmokadem filed a notice of appearance on the

---

[6]First Amended Counterclaim ("FAC"), Docket No. 79 (Nov. 10, 2009).

[7]Order Denying Counterclaimants' Motion for Contempt; Granting in Part and Denying in Part Counterdefendants' Motion to Dismiss Counterclaims, Docket No. 117 (Sept. 30, 2010).

[8]Order Granting Motion to Withdraw as Attorney, Docket No. 157 (May 6, 2011).

[9]*Id.* at 12.

[10]*Id.* at 12 & n. 60.

[11]Default by Clerk Entered as to Counterdefendant Degla, Docket No. 163 (June 20, 2011).

[12]Order Granting Defendants' *Ex Parte* Application to Dismiss Plaintiff Degla, Docket No. 167 (Aug. 3, 2011).

Sidkys' behalf.[13]

On September 16, 2011, the clerk entered Morshedy's default on the counterclaim.[14]  On July 19, 2012, the court granted BoConcept's motion for default judgment against Degla and Morshedy on the counterclaim.[15]  There remained for trial only BoConcept's first amended counterclaim against the Sidkys for fraud, breach of contract, declaratory relief, and a permanent injunction.  Following the parties' waiver of their right to a jury trial,[16] the breach of contract and fraud claims were tried to the court on December 4 and December 5, 2013.[17]  At the start of trial, the court notified BoConcept's attorney that its claim for a permanent injunction was not a cause of action, but that, if it were appropriate to do so, the court would enter a permanent injunction following a decision of the merits.[18]  Following trial, both parties submitted post-trial briefs

---

[13]Notice of Appearance of Ahmed Elmokadem, Docket No. 169 (Aug. 29, 2011).

[14]Default by Clerk Entered as to Counterdefendant Morshedy, Docket No. 189 (Sept. 16, 2011).

[15]Order Granting Counterclaimant's Motion for Default Judgment, Docket No. 213 (July 19, 2012).

[16]Transcript of Court Trial, Day 1 ("Day 1"), Docket No. 241 (Jan. 2, 2014), at 25:17-26:5.

[17]Minutes: 1st Day Court Trial, Docket No. 233 (Dec. 4, 2013); Minutes: 2nd Day Court Trial, Docket No. 234 (Dec. 5, 2013).  Specifically, the court told BoConcept that the claim for permanent injunction was not an independent cause of action, see *Gates v. Sprint Spectrum, L.P.*, 523 F.Supp.2d 1287, 1291 (D. Kan. 2007) ("Injunctive relief is a type of relief [plaintiff] seeks for the alleged trespass, not a cause of action"), but that the court would consider the claim part of the prayer for relief and enter a permanent injunction if appropriate.  (Day 1 at 14:14-20 ("The Court understands from Mr. Ver Halen that he is going to try the breach of contract and fraud claims in the counterclaim.  I know you said also permanent injunction.  This was in a conversation with the clerk.  Mr. Ver Halen, that's not a cause of action, and so if it's appropriate, the Court will enter a permanent injunction").)  BoConcept waived its declaratory relief claim by proceeding only on its breach of contract and fraud claims.  (See Transcript of Court Trial, Day 2 ("Day 2"), Docket No. 242 (Jan. 2, 2014), at 287:10-12 ("The Court: [T]hose are your two causes of action, correct?  Mr. Ver Halen: Yes, Your Honor").)

[18]Day 1 at 14:14-20.

4

detailing what they believed the evidence had established.[19]  Having considered the evidence and the parties' arguments, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT

### A.    The Parties Meet

1.    BoConcept is a company in the business of selling modern Danish furniture and accessories.[20]  It is a subsidiary of BoConcept A/S, which is based in Herning, Denmark.[21] The companies were formerly called Club 8 Franchise, but in 2006 they changed their name to BoConcept.[22]  BoConcept A/S currently has 250 store locations in 55 different countries.[23]

2.    In February 2006, BoConcept A/S had franchised stores in more than ten countries.[24] Within the United States, it had franchised stores in Massachusetts, New York, New Jersey, Virginia, Arizona, and the District of Columbia; these were operated by four or five different franchisees.[25]  It had no franchise locations in California; it relied instead on distributors who sold its products in the state.[26]

3.    Kim Moelholm began working for BoConcept as its Retail Director in 2000; he was

---

[19]Closing Brief of BoConcept ("BoConcept Brief"), Docket No. 239 (Dec. 31, 2013); Written Closing Argument by Hasan H Sidky and Hussein H Sidky ("the Sidkys Brief"), Docket No. 240 (Jan. 1, 2014).

[20]Day 1 at 36:13-14.

[21]*Id.* at 36:2-9.

[22]*Id.* at 37:15-23.

[23]*Id.* at 36:17-18.

[24]*Id.* at 3:13-21.

[25]*Id.* at 36:25-37:4; 63:7-12.

[26]*Id.* at 37:5-13.

stationed in its Bayonne, New Jersey office.[27]   Among his responsibilities was selling franchises in North America.[28]

4.   Carsten Pedersen has been President of BoConcept S/A's Americas operations and the President of BoConcept since 1992.[29]

5.   Hussein Sidky first heard of BoConcept when a BoConcept representative came to a furniture store in Arlington, Virginia that was partially owned by Sidky and his brother Hasan Sidky in 2004 or 2005; the BoConcept representative hoped to recruit the store to become a distributor of BoConcept products.[30]   In 2005, Pedersen and others encouraged Sidky to become a franchisee.[31]   In January or February 2006, Sidky contacted Moelholm and expressed an interest in becoming a franchisee.[32]   Moelholm gave Sidky a copy of the franchise application, which Sidky filled out and returned.[33]   In the application, Sidky represented that he had an investor whose net worth was $30 million and who could make $3 million immediately available in cash for investment in a franchise.[34]   Although he did not identify it in the application, the investor Sidky referenced was Degla Group for Investments ("Degla Group"), an Egyptian real estate development company based in Cairo, Egypt.[35]   Moelholm later came to understand through his conversations with

---

[27]*Id.* at 35:13-15, 36:11-12.

[28]*Id.* at 35:13-15.

[29]*Id.* at 99:9-17, 113:17-22.

[30]Day 2 at 208:10-209:16, 213:10-12.

[31]*Id.*, 209:21-210:7.

[32]Day 1 at 38:18-22.

[33]*Id.* at 38:21-22, 39:19-23; Exh. 1 (February 4, 2006 Franchise Application Form for Hussein Sidky ("Application")).

[34]Exh. 1 (Application).

[35]Day 2 at 211:17-24, 212:23-213:4.

1      Hussein Sidky that the investor was Degla Group.[36]

2  6.    Moelholm found Sidky's application "impressive," given his investor's net worth and the

3      immediate availability of a large amount of cash.[37]  BoConcept required franchisees to have

4      a minimum net worth that it believed was sufficient to operate the store the franchisee

5      proposed to open.[38]  For each store in a location like Santa Monica, California, for

6      example, BoConcept looked for potential franchisees who had approximately $500,000 in

7      assets.[39]  The net worth requirement was important to BoConcept, which wanted to ensure

8      that its franchisees had funds in place so that the businesses could be launched "in the right

9      way."[40]  Based on Sidky's representations in his application, Moelholm was not concerned

10     about Sidky's financial capacity.[41]

11 7.    Moelholm never asked that either of the Sidkys or Morshedy send him any personal

12     financial information.[42]

13 8.    On approximately February 10, 2006, Moelholm and Sidky met at the BoConcept office

14     in Bayonne, where Sidky watched a presentation regarding BoConcept's operating model.[43]

15     At Sidky's request and after he signed a confidentiality agreement, BoConcept gave him

16     information about the performance of its other franchises.[44]  At the conclusion of the

---

[36]Day 1 at 68:11-14.

[37]*Id.* at 39:5-11.

[38]*Id.* at 39:12-18.

[39]*Id.* at 64:23-65:14.

[40]*Id.* at 60:16-18.

[41]*Id.* at 39:12-18.

[42]*Id.* at 65:21-66:4.

[43]*Id.* at 40:1-9.

[44]*Id.* 41:10-20, 42:25-43:2; Exhibit 2 (February 10, 2006 Confidentiality Agreement Signed by Hussein Sidky).

meeting, the parties agreed to keep in touch and "do their due diligence."[45]

9.    In April or May 2006, Moelholm and Pedersen met with Sidky, Hasan Sidky, and Hassan Morshedy – the Sidkys' cousin – in Los Angeles to look at store locations.[46]  Morshedy had flown in from Cairo, Egypt, for the meeting and the Sidkys introduced him to Moelholm and Pedersen as the son of a very wealthy Egyptian real estate developer, i.e., the son of the owner of Degla Group.[47]  Morshedy told Moelholm that he was planning to move to Los Angeles to become part of the Sidkys' proposed BoConcept franchise.[48]  Moelholm testified that Morshedy's presence at that meeting gave him the sense that Sidky's representations about the net worth of the investor he had listed on his application were credible.[49]  Morshedy and the Sidkys told Moelholm that the three of them were forming an investment company, Degla, that would back the BoConcept franchise.[50]  They told him they would be principals of the company.[51]

10.   In April 2006, the Sidkys and Morshedy formed and incorporated Degla in California for the purpose of operating the BoConcept franchise.[52]  The Sidkys and Morshedy became the company's three shareholders, with Morshedy owning 75 percent of the company and each

---

[45]Day 1 at 43:22-44:1.

[46]*Id.* at 45:18-25, 46:15-18; Day 2 at 213:13-14.

[47]Day 1 at 45:18-25, 46:15-18.

[48]*Id.* at 46:24-47:2.

[49]*Id.* at 46:21-25.

[50]*Id.* at 47:5-14.

[51]*Id.*

[52]Day 2 at 213:15-18; Business Entity Detail for Degla Group for Investments, Inc., Business Entity Detail, California Secretary of State, www.kepler.sos.ca.gov (visited June 17, 2014).  The court takes judicial notice of the fact that the business entity detail for Degla reflects that the company was incorporated in California on April 21, 2006.

Sidky owning 12½ percent.[53]  Sidky became Degla's president and one of its managers.[54]  Hasan Sidky was the vice president and head of marketing.[55]  Morshedy was the head of sales.[56]

**B.    The Parties Negotiate the Franchise Contract**

11.    On May 30, 2006, the parties entered into a Letter of Intent that secured the Los Angeles territory for Degla, and outlined the three franchise locations it would open and the time frame within which it would do so.[57]  The Letter of Intent identified Degla as the "Purchaser" of the franchise; it was signed by Sidky as an "Authorized Party."[58]  In addition to signing the Letter of Intent, Sidky gave BoConcept a $9,000 check drawn on his personal bank account; one-third of this amount was to be applied to the $25,000 franchise fee for each of the three stores as a down-payment.[59]  Moelholm testified that he understood it was Sidky – not Degla – who entered into the Letter of Intent with BoConcept.[60]

12.    In June, July, and August 2006, the parties negotiated the terms of the Franchise Agreement; Sidky and his attorney did most of the negotiating on Degla's behalf,[61] while

---

[53]Day 2 at 213:21-24.

[54]*Id.* at 207:19-208:9.

[55]*Id.* at 214:3-9.

[56]*Id.* at 214:10-13.

[57]Day 1 at 47:18-25, 49:4-12; Exhibit 3 (May 30, 2006 Letter of Intent Between BoConcept and Degla ("Letter of Intent")).

[58]Exhibit 3 (Letter of Intent).

[59]Day 1 at 48:20-25, 49:4-12; Exh. 3 (Letter of Intent).

[60]Day 1 at 70:1-23.

[61]*Id.* at 49:15-50:4.

Moelholm represented BoConcept.[62]  BoConcept used a standard Franchise Agreement for all of its franchises.[63]  It has a policy that the terms of this agreement must remain the same; if the company agrees to any changes, the changes are reflected in an amendment that BoConcept drafts.[64]

13.   As relevant to this lawsuit, section 5(Q) of the standard Franchise Agreement provided that "[a]ll amounts due to the Company and its affiliates shall be and are personally guaranteed by all individual owners of the entity operating the Franchised Business."[65]  Sidky testified that he and Moelholm had many discussions about this provision, both before and after the parties entered into the agreement.[66]  Sidky stated that at one point Moelholm had told him BoConcept wanted a personal guarantee.[67]  Sidky testified that he responded: "There is no way we are doing a personal guarantee."  Moelholm allegedly replied: "Well, we need a personal guarantee."  Sidky testified that he then said: "Well, we don't ever do personal guarantees ever."[68]

14.   On August 9, 2006, Sidky sent Moelholm an email forwarding twelve concerns regarding the standard Franchise Agreement that his attorney had articulated.[69]  On August 10, 2006, Moelholm responded to each concern, stating either that BoConcept could make changes to the Franchise Agreement to address the concern or that it could not.  On August 12,

---

[62]*Id.* at 72:22-24.

[63]*Id.* at 53:22-24.

[64]*Id.*

[65]Exhibit 6 (Franchise Agreement, ¶ 5(Q)).

[66]Day 2 at 218:3-9.

[67]*Id.* at 218:10-17.

[68]*Id.* at 218:10-17.

[69]Day 1 at 50:10-13; Exhibit 4 (August 10, 2006 email chain Between Moelholm and Hussein Sidky ("August 10 email")); Exhibit 9 (August 9, 2006 email From Hussei Sidky to Moelholm ("August 9 email")).

2006, Sidky sent "final comments" to Moelholm's responses.[70]

15.   One comment relevant to this suit was the following statement by Sidky's attorney: "Section 5(Q) makes the individual owners of the business entities operating the franchise personally responsible for all amounts due to the Company.  This means that if you are operating as a corporation, the individual shareholders will be personally responsible for any debt to the Company.  This may defeat the purpose of operating as a corporation (or even an LLC) since the entity will not shield you from personal liability to the Company. I highly advise against this."[71]  Moelholm's response to this comment was: "This can only be removed by having an irrevocable bank guarantee for an amount equal to the estimated monthly breakeven point for your business."[72]  Moelholm testified that BoConcept required such a guarantee as consideration for removing section 5(Q) because a guarantee was necessary to address the exposure it faced if section 5(Q) were eliminated.[73]

16.   Although Sidky provided "final comments" to 7 of Moelholm's 9 responses, he did not respond to Moelholm's refusal to remove section 5(Q) unless Degla provided an irrevocable bank guarantee.[74]  Sidky did not express any disagreement with section 5(Q) at any point thereafter.[75]  Nor did Delga, Sidky or the other Degla owners provide an irrevocable bank guarantee.[76]

17.   Following this email exchange, BoConcept began to draft an amendment to the Franchise

---

[70]Exh. 4 (August 10 Email).

[71]*Id.*

[72]*Id.*

[73]Day 1 at 52:9-13.

[74]*Id.* at 52:14-16; Exh. 4 (August 10 Email).

[75]Day 1 at 53:1-4.

[76]*Id.* at 54:3-7.

1    Agreement documenting the changes to which the parties had agreed in the emails.[77]

2    Several drafts of the Amendment were exchanged before the parties agreed on a final

3    version.[78]

4    **C.      The Parties' Interactions Regarding Degla Group**

5    18.    On July 28, 2006, Sidky sent Moelholm an email responding to concerns Moelholm had

6    earlier expressed because BoConcept did not know how much money the Sidkys and

7    Morshedy expected Degla Group would loan them, or when Degla Group expected them

8    to repay the loan.[79]  Sidky wrote: "First of all[,] Degla is us . . . we are Degla.  We

9    represent Degla 100% in the USA, hence the USA incorporated name of 'Degla Group for

10   Investments, [I]nc[.]'  This is **not** a 2-way relationship where[ ] we are going to Degla in

11   Egypt for a loan and they are supporting us as a separate company.  No, the investment

12   in the Bo[ ]Concept franchise is an investment by Degla, both in the USA and Egypt; We

13   are the same. . . .   Hassan Morshedy's presence here supports that fact as well."[80]

14   Moelholm understood from this that Degla was an Egyptian company that wanted to do

15   business in the United States and that Sidky had access to its funds for that purpose.[81]

16   19.    On October 4, 2006, in response to Moelholm's request for proof concerning Degla's

17   financials,[82] Sidky sent Moelholm an email that attached a financial statement and a balance

18   sheet for Degla Group.[83]   Based on this email, Moelholm believed the Degla Group

---

20   [77]*Id.* at 53:14-18.

21   [78]*Id.* at 53:25-54:2; Exhibit 9 at 9 (November 2, 2006 Email from Moelholm to Hussein
22   Sidky ("November 2 Email")).

23   [79]Exhibit 9 at 5 (July 28, 2006 Email from Hussein Sidky to Moelholm).

24   [80]*Id.*

25   [81]Day 1 at 96:2-5.

26   [82]*Id.* at 60:8-18.

27   [83]*Id.* at 59:13-60:9; Exhibit 10 (October 5, 2006 email from Hussein Sidky to Moelholm
28   with Degla financials ("October 5 email")).

financial statements he had received reflected Sidky's financial capacity.[84]   Moelholm testified that he believed the financial statements were true and accurate and that he did not do any independent investigation to verify them.[85]   He stated that this information, together with meeting Morshedy and being told of Morshedy's wealth and his plans to move to Los Angeles to help run the business, "convinced [him] that the funds were there and [ ] that they [(the Sidkys and Morshedy) were financially able to run] the business."[86]

### D.      The Parties Sign the Franchise Agreement

20.   Between August and December 2006, negotiations were largely on hold while BoConcept awaited approval of its registration to operate as a franchisor in California.[87]   In January 2007, California approved BoConcept's registration.[88]

21.   Following this approval, on January 11, 2007, BoConcept sent Sidky the standard Franchise Agreement and finalized Amendment for execution.[89]   The Franchise Agreement was titled "BoConcept Franchise Agreement: BoConcept Franchise, Inc. [/] Degla Group for Investments INC."[90]   The first paragraph of the Agreement stated: "Agreement made . . . between BoConcept . . . and Hussein Sidky [o]f Degla Group for Investments INC."[91]

22.   The signature page of the Franchise Agreement is in two sections: one for the signatures of the franchisor and franchisee, and a second for acknowledgment by the franchisee's

---

[84]Day 1 at 66:5-17.

[85]*Id.* at 66:25-67:12.

[86]*Id.* at 60:21-24.

[87]*Id.* at 52:8-10.

[88]*Id.* at 55:1-4; 79:11-17; Exhibit 9 at 11 (January 5, 2007 Email Chain Between Moelholm and Hussein Sidky ("January 5 Email")).

[89]Day 1 at 56:16-22, 57:10-16; Exhibit 6 (January 11, 2007 Franchise Agreement ("Franchise Agreement")).

[90]Exhibit 6 at 1 (Franchise Agreement).

[91]*Id.* at 3

principals.

23.     The top section – for the franchisor's and franchisee's signatures – stated: "In witness whereof, the parties hereto have caused this Agreement to be duly executed on the date first above written." Below this, there are three signature blocks. The first, on the left, is labeled "BoConcept Franchise Inc."; below this, there are spaces after the words "By:" "Print Name:" and "Title." Specifically, it is laid out like this:

"BOCONCEPT

FRANCHISE, INC.


        By: _____

        Print Name: _____

        Title: _____ "

24.     In the spaces provided, Moelholm signed his name, printed his name, and wrote "Retail Director." The second and third signature blocks, to the right, are labeled "Franchisee" and have spaces following the words "By:" and "Print Name:" These signature blocks are laid out like this:

    "FRANCHISEE                          FRANCHISEE


        By: _____          By: _____

        Print Name: _____        Print Name: _____ "

25.     Sidky and Morshedy signed and printed their names in the appropriate spaces.[92]

26.     The acknowledgment section stated: "The following persons (the 'Principals') represent all individuals that hold an interest in Franchisee, directly or indirectly. By signing this acknowledgment, the Principals consent to the execution of this Agreement by Franchisee, and agree to be bound by those terms of the Agreement that relate to their duties and

_____

[92]Day 2 at 216:1-25.

obligations as Principals."[93]  Below that statement are three rows and two columns of lines:

"_____        _____

_____        _____

_____        _____"

27.     In the three rows in the first column, Sidky, Morshedy, and Hasan Sidky printed their names.[94]  Sidky testified that he printed, not signed, his name in this column because he understood that by doing so he would be identifying himself as a principal of Degla but would not be agreeing to be bound by a personal guarantee.[95]  He stated that he did so because his attorney had told him not to sign the agreement as a personal guarantor.[96]  He testified that he could not recall if he ever told Moelholm that his printed name was not intended to be a signature.[97]

28.     In the beginning of February 2007, Sidky sent the Franchise Agreement and a $22,000 check from Degla's bank account for the balance of the franchise fee to Moelholm; he did not send the Amendment.[98]  Moelholm sent Sidky an email stating: "We received the [Franchise Agreement and] check today.  Thank you for sending that.  We are, however, missing the amendment.  Please forward that as soon as possible as well."[99]  Sidky responded: "That should be attached along with the agreement because I signed it.  Please

---

[93]Exhibit 6 at 36 (Franchise Agreement).

[94]*Id.*

[95]Day 2 at 217:5-218-2.

[96]*Id.* at 218:18-21.

[97]*Id.* at 248:25-249-13.

[98]Day 1 at 57:9-16; Exhibit 6 (Franchise Agreement).

[99]Exhibit 7 (February 7, 2007 email chain between Moelholm and Hussein Sidky ("February 7 email")).

double check."[100]

29. The signature page for the Amendment is different than that included in the Franchise Agreement. The Amendment's signature page contains the following signature blocks:

"COMPANY:                                    FRANCHISEE:

BoConcept Franchise, Inc.               Degla Group Investments, Inc.

By: _____          By: _____

_____(authorized party)        _____(authorized party)"

30. Moelholm re-sent the Amendment to Sidky.[101] On the "By:" line for BoConcept, Moelholm had written the date and signed his name. Upon receiving the document, Sidky wrote the date and printed his name in the space provided for his signature and sent the document back to Moelholm.[102] Moelholm believed that the document bore Sidky's signature.[103]

31. Moelholm testified that he believed BoConcept had entered into a franchise agreement with Sidky, not Degla.[104] Sidky testified that he believed he and Morshedy had signed the Franchise Agreement in their capacity as representatives of Degla and that it was Degla – not he and Morshedy individually – that had entered into the agreement.[105]

**E.   Counterdefendants Become Delinquent on Payments to BoConcept**

32. The franchise opened in June or July 2007.[106] Counterdefendants had rented a storefront

---

[100]*Id.*

[101]Day 1 at 58:6-10; Exhibit 8 (February 7, 2007 Amendment to Franchise Agreement ("Amendment")).

[102]Day 1 at 58:6-10; Exhibit 8 (Amendment).

[103]Day 1 at 58:17-23.

[104]*Id.* at 74:10-22.

[105]Day 2 at 216:10-12.

[106]Day 1 at 59: 5-6.

in Santa Monica, for which they paid more than $40,000 per month.[107]  In the beginning, the store had good sales and the parties got along well.[108]  At some point, within three months of the store's opening, however, BoConcept and counterdefendants began ot have disagreements concerning the operation of the business.

33.   BoConcept was concerned that as owners, the Sidkys and Morshedy were not adequately involved in the store's operations; specifically, it felt the three were not spending enough time at the store and were not taking an active role in running it.[109]  BoConcept also discovered that the franchise was selling non-BoConcept merchandise using BoConcept invoices and BoConcept's terms and conditions.[110]

34.   Sidky testified that counterdefendants felt BoConcept had "conned" them into opening the store by promising that they would not need to make a heavy investment in order for the store to be profitable.[111]  He stated that BoConcept promised it would pay for all warehousing costs and that all counterdefendants needed to do was open a showroom.[112]  Contrary to these representations, he said, once the store opened, BoConcept told counterdefendants they needed to rent a warehouse because the store was so far from BoConcept's headquarters in Bayonne that furniture shipments were taking too long to reach customers.[113]  Sidky testified that counterdefendants did not believe the distance was the cause of the problem, and instead felt that BoConcept did not keep a sufficient amount

---

[107]Day 2 at 222:18-22.

[108]Day 1 at 61:3-4.

[109]*Id.* at 83:12-84:4.

[110]Day 2 at 159:17-22:1.

[111]*Id.* at 222:10-17.

[112]*Id.* at 222:18-22.

[113]*Id.* at 223:3-11.

of merchandise in stock.[114]  He said that when BoConcept had merchandise in stock, which was rare, it was shipped within three to four weeks, but that, when the merchandise was not in stock, it took more than two or three months to get furniture to the customer.[115] Whatever the reason, counterdefendants rented a 12,000-square-foot warehouse for $33,000 a month, an amount they had not budgeted.[116]  They also hired warehouse staff – six individuals and a manager – and purchased a truck and forklift so that they, instead of BoConcept, could deliver furniture to customers; they did so despite the fact that BoConcept was supposed to make the deliveries.[117]  Sidky testified that they purchased beds, sofas, chairs, and dining tables so they had stock stored locally that they could use to fill customers' orders in a timely manner.[118]

35. Sidky said that he complained so much about the warehouse situation that Viggo Moelholm – BoConcept's owner and Moelholm's father – flew to Los Angeles to meet with him.[119] At the meeting, Viggo Moelholm acknowledged that it was not intended that franchisees like counterdefendants absorb the financial cost of operating a warehouse.[120]  He suggested that once BoConcept expanded its operations to the west coast, counterdefendants be its main distributors in the region, since they had already obtained the warehouse.[121]

36. Shortly after this meeting and some time within six months of opening the store, BoConcept became concerned because the franchise was not making timely payments for

---

[114]*Id.* at 224:3-8.

[115]*Id.* at 226:22-227:7.

[116]*Id.* at 223:3-16, 226:7-9.

[117]*Id.* at 224:3-8, 226:19-21.

[118]*Id.* at 224:9-14.

[119]*Id.* at 225:22-226:6.

[120]*Id.* at 225:22-226:3.

[121]*Id.*

goods BoConcept had shipped.[122]   The franchise was supposed to take orders from customers and send them to BoConcept.  BoConcept then shipped the goods and sent the franchise an invoice and a packing slip.[123]   Section 5(Q) of the Franchise Agreement required that the franchise pay the amount of the invoice within thirty days of the invoice date.[124]

37.   The franchise, however, was more than 30 days in arrears on payments for purchased products.[125]   BoConcept's accounting department began to contact the franchise's accountant, Victor Cabassini, "on a frequent basis."[126]   Once the account became "substantially overdue," Pedersen became involved.[127]  Pedersen made multiple telephone calls to Sidky seeking an explanation.  Sidky assured Pedersen each time that he would instruct Cabassini to transfer the money to BoConcept's account.[128]  Sidky did not always follow through, however.[129]

38.   In October 2008, Pedersen and Moelholm flew to Santa Monica to discuss the matter with Sidky.[130]   The parties agreed that BoConcept would allow the franchise to make payments

---

[122]Day 1 at 61:11-13.

[123]*Id.* at 101:3-9, 119:25-120:10.

[124]*Id.* at 101:3-9; Exhibit 6 at 20 (Franchise Agreement, ¶ 5(Q)).  Specifically, Section 5(Q) provided that "Franchisee ha[d] thirty (30) calendar days from the date of any Company invoice to dispute (in writing) the contents thereof and after said thirty (30) calendar days all Company invoices [were to] be deemed final, unless waived in writing by Company."  (Exhibit 6 at 20 (Franchise Agreement, ¶ 5(Q)).)

[125]Day 1 at 106:12-15.

[126]*Id.* at 106:25-107:7.

[127]*Id.* at 107:13-22.

[128]*Id.* at 107:15-20.

[129]*Id.* at 107:21-22.

[130]*Id.* at 110:4-10, 130:7-12.

60 days from the date of the invoice until December 31, 2008, at which time counterdefendants promised not only to make timely payments on the orders Degla placed but also to be current on all overdue amounts.[131]  When the franchise failed to make timely payments pursuant to the agreement, BoConcept began to require that the franchise provide a faxed copy of a check drawn in BoConcept's favor before it released the goods.[132]   Once it received the faxed copy of the check, BoConcept released the merchandise while the check was in the mail.  The franchise stopped payment on at least four of these checks, which totaled $173,070.[133]  Sidky testified that counterdefendants stopped payment on at least two of the checks because Degla had received the packing slips for the covered invoice and they did not match the merchandise that had been ordered.[134]  Three of the checks, however, bear a "Stop Payment: Insufficient Funds" stamp.[135]

39.  Towards the end of 2008 or beginning of 2009, when none of BoConcept's efforts to bring counterdefendants current had borne fruit, BoConcept began to require that the franchise pay cash on delivery ("COD") for product.  Stated differently, BoConcept required that the franchise pay for an order before BoConcept would ship the merchandise.[136]  BoConcept stated that it would apply the payment to the oldest unpaid invoice, however, rather than to the new invoice, which was to be paid within 30 days per the terms of the Franchise Agreement.[137]

---

[131]*Id.* at 110:4-10.

[132]*Id.* at 107:22-108:10.

[133]*Id.* at 108:3-7; Exhibit 12 (October 31, 2008, December 4, 2008, February 19, 2009, and February 24, 2009 Stopped Payment Checks ("Checks").

[134]Day 2 at 271:3-24.

[135]Exhibit 12 (Checks).

[136]Day 1 at 109:13-17; Day 2 at 174:16-24.

[137]Day 2 at 199:25-200:16.  For example, if Degla made a $45,000 payment, BoConcept would apply that payment to the oldest unpaid invoice and release $45,000-worth of merchandise

40.  BoConcept uses Axapta, a software system, on a company-wide basis; it installs the system at each franchise store.  The system inputs financial records for each franchise, such as shipments and payments.[138]  When a customer purchases product from a BoConcept franchise store, the order is entered via the Axapta program and is automatically transferred to BoConcept.[139]  BoConcept uses the information to fill the order by shipping product to the customer either from its U.S. headquarters in New Jersey or from its global headquarters in Denmark.[140]

41.  When BoConcept placed counterdefendants' franchise on a cash on delivery basis, it did not change the payment terms reflected in the Axapta system, which continued to reflect that payment was due for new orders on a 30-day net basis.[141]

42.  On February 10, 2009, Pedersen wrote Hasan Sidky an email in which he stated that counterdefendants owed BoConcept A/S $154,235.52 to and BoConcept $463,529.00.[142]  Pedersen testified that he received these figures from Ed Witkowski, BoConcept's controller, who would have calculated the amount owed BoConcept by using Axapta to compare invoiced merchandise with payments received; he would have obtained the BoConcept A/S figure by speaking with someone in BoConcept A/S's accounting department in Denmark.[143]

---

ordered by Degla in a new invoice.  (*Id.*)

[138]Day 1 at 102:10-103:15.

[139]*Id.* at 104:3-7.

[140]*Id.* at 104:17-105:20.

[141]Day 2 at 178-183.

[142]Exhibit 13 (February 10, 2009 email from Pedersen to Hasan Sidky ("February 10 email")).

[143]Day 1 at 111:20-24, 117:8-20.

43. Degla never brought its payments current.[144]

44. On May 1, 2009, Pedersen wrote an email to the Sidkys in which he addressed whether and under what terms BoConcept would allow counterdefendants to open a second BoConcept store in Los Angeles, as contemplated by the parties' Letter of Intent. Pederson stated that the franchise's "[c]urrent liability to BoConcept NJ and [Denmark] [was] [ ] app[roximately] $650k combined."[145]   He proposed to convert $500,000 of what the franchise owed into a loan and to permit them to open a second store if they could show that they had approximately $650,000 to invest in the second location.[146] He stated that one of the conditions of this new plan was that BoConcept would "need to have a personal guarantee for the outstanding amount [of the loan]."[147]

45. Hasan Sidky responded to Pedersen's email.  He did not dispute the amount owed,[148] but stated that "[p]ersonal guarantees are out of the question for us and we would rather walk away th[a]n get tied into such a lopsided deal like this."[149]

46. Pedersen testified that he obtained the $650,000 figure from Witkowski and that from BoConcept's point of view, that represented a significant indebtedness.[150] He also stated that despite repeated notifications to Sidky regarding amounts owed, Sidky never disputed the outstanding balance.[151]

---

[144]*Id.* at 112:20-22.

[145]Exhibit 15 (May 1, 2009 Email Chain Between Pedersen and the Sidkys ("May 1 Email")).

[146]*Id.*

[147]*Id.*

[148]See *id.*

[149]*Id.*

[150]*Id.* at 127:17-19; Day 2 at 189:14-20.

[151]Day 2 at 161:19-22, 226:3-9.

47.   Sidky testified that BoConcept sent the franchise invoices for the same product with the same SKUs two, three, or even four times demanding payment, and demanded that the franchise pay double, triple, or even quadruple what it actually owed.[152]   None of the invoices submitted at trial appears to be a duplicate of other invoices, however, as they do not reflect duplicate SKUs or invoice numbers.[153]   Sidky also testified that BoConcept sent the franchise invoices demanding payment for goods it had ordered but never received.[154]

48.   In June 2009, BoConcept decided to terminate the Franchise Agreement,[155] and sent the franchise with a termination notice.[156]

49.   After receiving the notice of termination from BoConcept, counterdefendants continued to write orders for the sale of BoConcept furniture.[157]   Shortly thereafter, BoConcept began receiving emails from customers, who complained that they had made deposits on furniture at the franchise that had not been delivered.   BoConcept discovered outstanding orders placed through Axapta for which customers had made a deposit that had not yet been delivered.[158]   Two BoConcept employees identified all of the customers, contacted them,

---

[152]*Id.* at 225:14-19.

[153]See Exhibit 14 (2011 BoConcept Aging Report for Degla ("Aging Report")).

[154]Day 2 at 226:4-14.

[155]Day 1 at 110:17-23.

[156]*Id.* at 61:16-20.

[157]Day 2 at 255:6-16.

[158]*Id.* at 160:2-23:7.   The court overruled the Sidkys' objection to the testimony regarding customer complaints, stating that it would consider them only insofar as they were evidence of Pedersen's state of mind.   See FED.R.EVID. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence *to prove the truth of the matter asserted in the statement*" (emphasis added)); *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1456 (9th Cir. 1983) ("Haddad also argues that the district court improperly admitted hearsay testimony by Lockheed management regarding third parties' complaints about working with Haddad.   However, this testimony was not hearsay: it was not offered to prove the truth of the complaints.   See Fed.R.Evid. 801(c).   Instead, this testimony

confirmed that they had not received the merchandise on which they had paid a deposit, and created a record of the accounts.[159]   BoConcept delivered the merchandise the customers had ordered at a cost to it of $66,043.66.[160]   Pedersen could not recall if BoConcept ever received any payment towards this amount from the customers or whether all had fully paid the franchise for the furniture they ordered prior to BoConcept's involvement in fulfilling the orders.[161]

50.   Pedersen testified that he believed counterdefendants owed BoConcept A/S $140,338.60 and BoConcept $484,188.57.  This belief was based on the numbers in an aging report the company had printed in 2011.[162]

---

was offered to show that Lockheed management had received complaints regarding Haddad.  Such testimony was relevant in demonstrating Lockheed's non-discriminatory intent in its employment practices.  See Fed.R.Evid. 803(3).  The court's admission of the evidence was not an abuse of its discretion"); see also *Ommen v. Bunker*, 114 F.3d 1195, 1997 WL 267775, *1 (9th Cir. May 20, 1997) (Unpub. Disp.) ("Assuming Jeffrey Ommen has not waived his objections to the evidence Federal Express submitted in support of its motion for summary judgment, we hold the district court did not abuse its discretion in considering the anonymous letter and operations managers' complaints because they were not hearsay.  Federal Express did not offer these out-of-court statements to prove the truth of what they asserted but rather to show Federal Express had made inquiries to verify complaints it received and all of the operations managers said they were dissatisfied with Ommen's performance"); *Means v. City and County of San Francisco, Department of Public Health* 749 F.Supp.2d 998, 1005 n. 2 (N.D. Cal. 2010) ("Means seeks to exclude a portion of Baluyut's declaration in which Baluyut says that 'Ms. Means made a series of inappropriate sexual comments to patients in Unit G3 at Laguna Honda' and that residents 'said Ms. Means used "disgusting" words.'  Means argues that Baluyut's statements are inadmissible hearsay and inadmissible opinion evidence, and that Baluyut lacks personal knowledge.  However, this evidence is not being offered for its truth, but rather its impact upon Baluyut, the decision maker, and is therefore not hearsay").

[159]Day 2 at 165:19-29:2.

[160]*Id.* at 160:12-17; Exhibit 17 (October 30, 2009-April 30, 2010 Accounts Receivable for Items Purchased at Degla's Santa Monica Store but Never Shipped ("2009-10 Accounts Receivable")).

[161]Day 2 at 167:3-8.

[162]*Id.* at 164:10-13; Exhibit 14 (Aging Report).

51. Witkowski submitted a declaration in support of BoConcept's motion for default judgment against Morshedy and Degla in which he stated that they owed BoConcept $470,093.20 as of April 2009, without interest.[163]   Pedersen testified that the difference between this amount and the $650,000 he included in his May 1, 2009 email to counterdefendants may have reflected accrued interest.[164]

52. Any conclusions of law that are deemed to be findings of fact are incorporated herein as such.

## II.  CONCLUSIONS OF LAW

53. BoConcept's first cause of action alleges breach of contract.  The company argues that the Sidkys were parties to the Franchise Agreement, either as the franchisees, or as principals who expressly agreed to be personally liable as guarantors.   It contends the Sidkys breached the contract when they failed to pay for merchandise they ordered from BoConcept,[165] and asserts that their breach caused $624,527.17 in damages, i.e., in unpaid invoices and accumulated interest and penalties.[166]

54. The Sidkys counter that the contract was only between BoConcept and Degla, and that they did not intend their printed names in the Acknowledgment section of the Franchise Agreement to be signatures.  As a consequence, they assert the printed names did not create a guaranty contract between them and BoConcept.  They argue that any ambiguity as to the identity of the franchisee should be construed against BoConcept because it is the party that drafted the Franchise Agreement.  They also contend that the numbers on the aging report are unreliable; specifically, they maintain that the fact that the numbers

---

[163]Exh. 20 (Declaration of Ed Witkowski ("Witkowski Decl."), ¶ 13).

[164]Day 2:190-194.

[165]*Id.* at 283 (citing to Exhibit 14 and 17).

[166]BoConcept Brief at 8.

increased after BoConcept placed the franchise on COD basis shows that the aging report did not recognize their COD status and thus reflected amounts as outstanding that had been paid.  They argue that the damages sought are thus completely unreliable.  Finally, they argue that BoConcept did not mitigate damages because it waited a year and a half to put the franchise on a COD basis, and never asked any of the individual counterdefendants to make payments in their personal capacity.

55.   The Franchise Agreement contains a choice of law provision that states that the contract is governed by Kansas law.[167]  "The elements [of] a breach of contract claim under Kansas law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff suffered damage caused by the breach."  *Stouder v. M&A Tech., Inc.*, No. 09-4113-JAR-KGS2010 WL 2044666, *6 (D. Kan. May 24, 2010) (citing *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F.Supp.2d 1179, 1187 (D. Kan. 2003)).

56.   "A guarantee is a contract between two or more persons, founded upon consideration, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking."  *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 645-46 (1983).  "Whether or not a guarantee has been formed is determined by the legal rules applicable to any contract."  *Farmers & Merchants State Bank v. Batson*, No. 60,240, 1987 Kan. App. LEXIS 1414, *3 (Kan. App. Dec. 31, 1987) (citing *Timi v. Prescott State Bank*, 220 Kan. 377, 388 (1976) ("Like any other contract, [a guarantee's] formation is governed by principles of mutual assent, adequate consideration, definiteness and a meeting of the minds")).

57.   The parties do not dispute that the Franchise Agreement was a contract, that both parties

---

[167]Exhibit 6 (Franchise Agremeent at 32, ¶ 9(F) ("THIS AGREEMENT AND THE FRANCHISE SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF KANSAS")).

received consideration in exchange for their agreement to its terms, or that there was a breach of the contract when BoConcept's invoices were not paid.  Rather, they dispute who the parties to the Franchise Agreement were, whether the Sidkys and BoConcept entered into a guaranty agreement, and whether BoConcept proved its damages.

58.   The court need not determine whether Degla, or the Sidkys and Morshedy, were parties to the Franchise Agreement.   Assuming the terms of the Franchise Agreement are ambiguous, and construing the contract in the manner the Sidkys advocate – i.e., finding that Degla was the franchisee – the Sidkys are nonetheless bound to pay the debt Degla incurred under that contract because they entered into a guaranty agreement with BoConcept when they wrote their names in the Acknowledgment section of the contract.

A.      The Sidkys Entered into a Guaranty Agreement with BoConcept

59.   "A written contract, free from ambiguity, can be construed as a matter of law." *Beech Acceptance Corp. v. Connell*, No. 88-0180-C, 1990 WL 129448, *7 (D. Kan. Aug. 21, 1990) (citing *Bank of Oklahoma v. Fidelity State Bank & Trust Co.*, 623 F.Supp. 479, 486 (D. Kan. 1985) ("Where the provisions of a written contract are clear and unambiguous, there is no occasion for applying the rules of construction, and the contract must be enforced according to its terms so as to give effect to the intention of the parties; that must be determined from the 'four corners' of the instrument itself.  The intention of the parties and the meaning of a contract are to be deduced from the instrument where its terms are plain and unambiguous" (internal citations omitted)).  "The fundamental rule in construing the effect of written instruments is that the intent and purposes of the parties be determined from an examination of the entire instrument or from its four corners.  Thus the language used anywhere in the instrument should be taken into consideration and construed in harmony with other provisions." *Heyen v. Hartnett*, 235 Kan. 117, 122 (1984).  "[T]he facts and circumstances surrounding [a contract's] execution become competent only in the event the instrument is ambiguous on its face and requires aid to clarify its intent." *Bank of Oklahoma*, 623 F.Supp. at 486.

60.   The Sidkys argue that they did not enter into a guaranty agreement with BoConcept

27

because they only printed, not signed, their names in the Acknowledgment section of the Franchise Agreement.[168]  They printed their names, they argue, to identify themselves as principals of Degla but did not sign their names because they believed that by not signing, they would not become guarantors.  They did not want to become guarantors because they did not want to be personally liable for the franchise's debts.[169]

61.  Under Kansas's statute of frauds, a guarantee or surety contract is not enforceable unless certain statutory requirements are met.  See KAN. STAT. § 33-106 ("No action shall be brought whereby to charge a party upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the part to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing"); see also *Botkin v. Sec. State Bank*, 281 Kan. 243, 248 (2006) ("Because the guaranties in the instant case are 'promises to answer for the debt, default or miscarriage of another' they are subject to the statute of frauds").  Because the Acknowledgment section is a guaranty provision, providing that Degla's principals will be personally liable for all debts Degla incurs to BoConcept, it is subject to Kansas's statute of frauds.  See *Zukel v. Great West Managers, LLC*, 31 Kan.App.2d 1098, 1104-05 (2003) (applying § 33-106 to a guaranty provision included in a contract to sell a store).  Consequently, the guaranty provision must "be in writing and signed by the party to be charged" in order to be enforceable.  See KAN. STAT. § 33-106.

62.  The guaranty provision satisfies these requirements.  First, it was in writing.  Section 5(Q) of the contract provided that "[a]ll amounts due to [BoConcept] and its affiliates shall be and are personally guaranteed by all individual owners of the entity operating the Franchised Business, whether invoicing is to the entity or all or some of the individual

---

[168]Sidky Brief at 6.

[169]*Id.*

28

owners."[170]  The Acknowledgment section states: "The following persons (the 'Principals') represent all individuals that hold an interest in Franchisee, directly or indirectly.  By signing this acknowledgment, the Principals consent to the execution of this Agreement by Franchisee, and agree to be bound by those terms of the Agreement that relate to their duties and obligations as Principals."[171]

63.     Second, the court finds that both of the Sidkys signed the Acknowledgment section in their individual capacities as guarantors when each printed his name there.  "The law in Kansas is that a signature may be by mark, initials, typewriter, print or stamp, or any other symbol if by placing the symbol on the document the person so doing intended the symbol to be a binding signature."  *Board of County Comm'rs v. Kearney*, 8 Kan.App.2d 534, 535 (1983) (citing *Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.*, 205 Kan. 684, 690 (1970) (concluding, under the Uniform Commercial Code ("UCC"), that the term "signed" included any symbol executed or adopted by a party intending to authenticate a writing, and that such symbol could be printed, stamped, or written), and *Guthrie v. Anderson*, 49 Kan. 416, 420 (1892)).  Comment two to Kansas Statute § 84-3-401, Kansas' UCC, states that "[a] signature may be handwritten, typed, printed or made in any other manner."  *Id.*; see also *Southwest Engineering Co.*, 205 Kan. at 690 (holding, in the context of a contract for the sale of goods, that a printed name constituted a signature for purposes of the UCC).

64.     In *Airlines Reporting Corp. v. Travel Services Clearinghouse*, 778 F.Supp. 1141 (D. Kan. 1991), the district court held that the broad UCC definition of "signature" did not apply to a guaranty contract between an airline and a travel agency, which was signed by an individual on the agency's behalf, because the agreement concerned the processing of airline tickets, and thus did "not involve the sale of goods, or any other transaction governed by the UCC."  The court therefore concluded that even though the individual

---

[170]Exhibit 6 (Franchise Agreement at 20, ¶ 5(Q)).

[171]Exhibit 6 (Franchise Agreement at 36).

defendant, Michael D. Webb, had hand-printed his name on the contract, the agreement did not satisfy the Kansas statute of frauds because he had not also signed it. *Id.* at 1144.

65. The Sidkys contend that under *Airlines Reporting*, the fact that they printed their names did not constitute execution of the agreement.[172] *Airlines Reporting* is a federal district court case, however.  It is therefore not binding upon this court and is only persuasive to the extent the court believes the holding in the case reflects the law as the Kansas Supreme Court would interpret it to be.  The court cannot make such a finding.  In a subsequent case Webb filed against Airlines Reporting Corporation for malicious prosecution, the Tenth Circuit disagreed with the district court's holding that the UCC definition was not applicable, stating: "The Kansas Statute of Frauds does not address what constitutes 'signed,' however, '[t]he law of Kansas is that a signature may be by mark, initials, typewriter, print or stamp, or any other symbol if by placing the symbol on the document the person so doing intended the symbol to be a binding signature.'" *Webb v. Airlines Reporting Corp.*, 57 F.3d 1081, 1995 WL 354841, *1 n. 2 (10th Cir. June 6, 1995) (Unpub. Disp.) (citing *Kearney*, 8 Kan.App.2d at 535 (second alteration original)).

66. The court finds *Airlines Reporting* unpersuasive for the additional reason that it is distinguishable in a material way from this case.  The contract in *Airlines Reporting* explicitly provided a space where the guarantor was to write his name and a space where he was to sign it.  *Id.* at 1143 ("At the end of the guaranty at issue are two lines.  Under the first line appears '(Guarantor).'  Under the second line appears '(Print name of guarantor).'  Handprinted above the second line is 'Michael D. Webb.'  Nothing appears above the first line").  Although Webb had written his name in the space provided for his printed name, he had not signed the contract in the space provided for his signature.  The found that under these circumstances, his printed name did not constitute a signature.  *Id.* Here, by contrast, the acknowledgment only has a line for the guarantor's signature; on

---

[172]Sidky Brief at 7-8.

that line, the Sidkys and Morshedy handprinted their names.[173]  For that reason, *Airlines Reporting* is not on all-fours with the facts of this case.

67.  Having concluded that the Sidkys' handwritten names can constitute signatures under Kansas law, the court next evaluates whether BoConcept proved that the Sidkys intended for their written names to be binding signatures.  The court finds that it did.

68.  "Intent is normally a question of fact . . . , and may be shown by acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof." *Allegri v. Providence-St. Margaret Health Center*, 9 Kan.App.2d 659, 663 (1984); see also *Armstrong v. Cities Service Gas Co.*, 210 Kan. 298, 308 (1972) ("[I]ntent [ ] is evidenced by conduct, verbal or otherwise"); *State v. Wilfong*, 114 Kan. 689, 689 (1923) ("It is not easy to prove knowledge and intent by direct evidence, but when the circumstances stated were shown, they naturally, logically, and clearly lead to and justify the inference of [ ] intent").

69.  Here, the Sidky's actions and the surrounding circumstances show that they intended their printed names to be signatures.  First, as noted, the terms of the Acknowledgment specifically called for a signature; it stated that "[b]y *signing* this acknowledgment, the Principals consent to the execution of this Agreement by Franchisee, and agree to be bound by those terms of the Agreement that relate to their duties and obligations as Principals."[174] It is reasonable to infer that a person who writes his name underneath such a statement – even if he prints it – intends by that act to sign the contract.  Second, circumstantial evidence shows the Sidkys intended to be bound by printing their names.  Although Sidky testified at trial that he printed his name simply to identify himself as a principal and

---

[173]Exhibit 6 at 36 (Franchise Agreement).  The franchise agreement has two lines under the heading "franchisee."  One is headed "By:" and the other "Print Name:"  By contrast, the Acknowledgment section contains space only for a signature; it does not request that the signor print his name.  As noted, it calls specifically for a signature, and states that "[b]y signing this acknowledgment, the Principals" agree to act as guarantors of the franchisee.

[174]Exhibit 6 (Franchise Agreement at 36 (emphasis added)).

purposefully did not sign his name in cursive because he did not want to be bound by the guaranty agreement, the court does not find this testimony credible. Sidky also testified that he knew the guaranty provision and an acknowledgment of that provision were in the contract, and did not tell BoConcept when he sent the Franchise Agreement back to it that his printed name was not meant to be a signature. Nor did he do so several days later when Moelholm told him that BoConcept had received the Franchise Agreement and check but not the amendment. Like Sidky, Hasan Sidky printed his name in the Acknowledgment section but never notified BoConcept that his printed name was not intended to be a signature despite the clear direction in the Acknowledgment section that guarantors were to affix their signatures. The Sidkys knew that BoConcept would not enter into a Franchise Agreement absent personal or bank guarantees. The Sidkys wanted to operate a BoConcept franchise, and thus printed their names in the Acknowledgment section to secure the right to do so. The court thus concludes that they intended to sign the Acknowledgment

70. Nor were the actions of either Sidky consistent with an intent not to be bound by the guaranty provision; neither crossed out Section 5(Q), which set forth guarantors' duties and obligations as principals of Degla. Both Sidkys knew BoConcept would not delete the guaranty provision absent an irrevocable bank guarantee equal to the estimated monthly breakeven point for the store; they knew they could not obtain a franchise without a personal guarantee or a bank guarantee. Sidky, in fact, did not respond to the portion of BoConcept's email that set forth its position on this issue.

71. For all of these reasons, the court concludes that the Sidkys intended their printed names to their signatures, and that their signatures in the Acknowledgment section of the Franchise Agreement satisfy the Kansas statute of frauds and bind the Sidkys to the contract as guarantors.

**B.    Whether BoConcept Performed Under the Contract**

72. As noted, to prevail on a breach of contract claim under Kansas law, a plaintiff must prove that it performed its obligations under the contract.

73. Although the Sidkys did not argue in their post-trial brief that BoConcept failed to perform under the contract, Sidky's testimony that BoConcept sent the franchise invoices for goods it never shipped and demanded that Degla pay the same invoice more than once implies such an argument. The court therefore addresses it below.

74. Other than this testimony, the Sidkys did not adduce evidence that BoConcept sent them invoices for goods it never shipped and demanded duplicative payments. The evidence in the record, in fact, does not support Sidky's testimony, as the invoices in evidence do not reflect duplicate SKUs and none of the aging reports reflects duplicate invoices. The invoices are more credible proof on this issue than Sidky, as Pedersen testified that they were generated in the normal course of business by the Axapta program when goods that had been ordered were shipped. Sidky, moreover, did not testify that the invoices introduced at trial were incomplete in any respect. The court therefore concludes that the Sidkys did not show that BoConcept failed to comply with the terms of the agreement.

75. In short, the court concludes that BoConcept established it performed under the contract. Pedersen's testimony showed that BoConcept allowed the franchise to use its name in offering products to the public and that it complied with the agreement by shipping products the franchise ordered and issuing invoices to the franchise upon shipment. This element of the claim is therefore satisfied.

### C.    Whether Degla Breached the Contract

76. Section 5(Q) of the Franchise Agreement required that the franchise "[m]ake prompt payment of all amounts due to [BoConcept] and its affiliates[.]"[175]

77. The Sidkys do not dispute that the franchise failed to pay amounts it owed BoConcept. Both Pedersen and Moelholm testified that the franchise failed to comply with its obligations under the Franchise Agreement by making timely payments for all of the products for which orders were submitted.

78. The court accordingly concludes that the franchise breached the parties' contract. The

---

[175]Exhibit 6 (Franchise Agreement at 20, ¶ 5(Q)).

Sidkys, as guarantors of the contract, are therefore liable for the amount of damages caused by its breach.

**D.      The Measure of BoConcept's Damages**

79.    The Sidkys do dispute the amount BoConcept is owed, and argue that BoConcept failed to prove its damages with sufficient specificity to permit a damages award.

80.    "[A]bsolute certainty is not required in establishing damages." *Johnson v. Baker*, 11 Kan.App.2d 274, 277 (1986).  Nonetheless, damages that "are remote, contingent and speculative in character cannot serve to support a judgment" in a breach of contract case. *Apperson v. Security State Bank*, 215 Kan. 724, 724 (1974); see also *MLK, Inc. v. University of Kansas*, 23 Kan.App.2d 876, 887 (1997) (same); *Source Direct, Inc. v. Mantell*, 19 Kan.App.2d 399, 409 (1994) (same); *Johnson*, 11 Kan.App.2d at 276 ("Damages cannot be awarded when they are too conjectural and speculative to form a sound basis for measurement").

81.    "Generally, in an action for breach of contract, plaintiff must establish the amount of his damages with reasonable certainty, and there can be no award of damages for breach of contract where there is no proof that damages have been sustained by the breach or no evidence by which the amount of damages can be measured." *Source Direct, Inc. v. Mantell*, 19 Kan.App.2d 399, 409 (1994) (internal citation and quotation marks omitted). "'In order for the evidence to be sufficient to warrant recovery of damages, there must be some reasonable basis for computation which will enable the [trier of fact] to arrive at an approximate estimate thereof.'" *Id.* (citing *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43 (1974)).

82.    As noted, BoConcept claims that Degla, and therefore the Sidkys, owe it $484,188.57 and that they owe BoConcept A/S $140,338.60, or a combined total of $624,527.17.  These amounts are reflected in an aging report created on August 31, 2011; the aging report adds "invoiced interest" and accrued interest to these amounts.  These amounts, which

BoConcept does not seek to recover, bring the total to $947,290.66.[176]  Pedersen testified that the aging report reflects all unpaid invoices; any invoice that had been paid is not reflected on the report.[177]

83.   The declaration Witkowski filed in support of BoConcept's motion for entry of default judgment against Degla and Morshedy is, for the most part, consistent with the aging report.  In the declaration, Witkowski represented that as of September 30, 2011, Degla owed BoConcept $484,188.57 and BoConcept A/S $140,338.60, or a total of $624,527.17.[178]  To this amount, Witkowski added interest of $98,340.13, bringing the amount owed to $957,634.60.[179]

84.   Pedersen's February 10, 2009 and May 1, 2009 emails, however, are inconsistent with the amounts reflected in the aging report and in Witkowski's declaration.  In the February 10 email, Pedersen stated that Degla owed BoConcept $463,529.00 and BoConcept A/S $154,235.52, or a total of $617,764.52.  In the May 1 email, Pedersen stated that Degla owed BoConcept and BoConcept A/S collectively approximately $650,000.  At trial, Pedersen was not able to explain the differences between the amounts reflected in the aging report and Witkowski's declaration, and the amounts stated in his 2009 emails.  Pedersen speculated that the difference between the amounts reflected in his February 10 and May 1 emails may have been interest.[180]  The aging report, however, shows that interest was

---

[176]Exhibit 14 (Aging Report); BoConcept Brief at 8 ("The aging report and invoices admitted into evidence as Exhibit 14 and the aging report referenced at trial as Exhibit B to Exhibit 20 both demonstrate that the sum of $140,338.60 appearing at the bottom of the first column captioned 'Product Invoice Due BoConcept A/S' and the $484,188.57 appearing at the bottom of the fourth column captioned 'Product Invoice Due BoConcept USA A/C 530['] are the balances outstanding which BOC is herein seeking to recover").

[177]Day 2 at 156:20-25, 184:13-16.

[178]Witkowski Decl., ¶ 18.

[179]Id.

[180]Day 2:190-194.

accruing at approximately $1,000 per month at that time; interest, therefore, likely does
not explain the difference between the figures.

85.    To the extent the numbers in Pedersen's 2009 emails conflict with the aging report and
Witkowski's declaration, they are not so different that the court lacks a reasonable basis
for measuring damages.

86.    The court finds the aging report a more reliable source of information than Pedersen's
emails.  The emails do not identify the source of the amounts Pedersen included therein.
Pedersen testified that he got the numbers from Witkowski.  Witkowski did not testify at
trial and therefore did not explain how he arrived at the numbers.  The aging report, which
breaks down the amount Degla owed to BoConcept by month based on unpaid, numbered
invoices, and which Pedersen testified was prepared in the normal course of business, is
thus more reliable than the figures contained in Pedersen's emails.

87.    With respect to the numbers reflected in the aging report, trial testimony established that
BoConcept put counterdefendants on a modified COD payment plan at the end of
December 2008, which remained in place until BoConcept terminated the Franchise
Agreement; under this plan, Degla had to pay for goods in advance in order to have them
shipped.  Once it received a payment, BoConcept shipped the newly ordered goods,
applied the payment to the oldest unpaid invoice, and issued an invoice for the newly
ordered goods, payable in 30 days.  Under this arrangement, if Degla timely paid for
newly ordered goods, the amount it owed BoConcept should have gone down by the
amount of the invoice for newly ordered goods.[181]  Degla, however, did not pay new

---

[181]For example, if Degla ordered $30,000 of goods, it would have made a $30,000 payment
at the time it placed its order.  BoConcept would have applied this payment to the oldest unpaid
invoice.  Had Degla then paid the invoice for the newly ordered goods by sending BoConcept
$30,000 within 30 days, its overall debt to BoConcept would have been reduced by that amount.

invoices within 30 days.[182]  As a result, its debt to BoConcept should have stayed the same after December 2008.[183]

88.  The aging report, however, reflects that Degla's debt continued to rise significantly each month after December 2008.  The report states that on December 31, 2008, the franchise owed BoConcept A/S $139,083.99 and BoConcept $66,000, or a total of $205,083.99. It shows that by December 31, 2009, Degla owed BoConcept A/S $140,338.60 and BoConcept $484,188.57, or a total of $624,527.17.

89.  The only way in which the franchise's debt could have increased during this period was if BoConcept shipped product without requiring that Degla make a contemporaneous payment under the terms of the modified COD plan or if it was adding interest to the amount of the outstanding debt.

90.  As noted, however, both parties agree that the terms of the modified COD plan were in effect from December 2008 until BoConcept terminated the Franchise Agreement.  The Sidkys suggested at trial that perhaps the amount owed continued to rise each month because BoConcept did not update the Axapta system to reflect the modified COD plan. This does not appear to have been the cause of the additional debt, however.  As noted, although the parties agreed that BoConcept would not release goods unless Degla made a simultaneous payment towards the oldest unpaid invoice, Degla was still required to pay

---

[182]Degla stopped payment on three checks totaling $94,070 in December 2008 and February 2009.  (There was a fourth check in the amount of $79,000 on which payment was stopped in November 2008.)  There was no evidence at trial as to whether the aging report reflected the checks on which payment was stopped.  There is only one entry on the report that appears to correspond with the amount of one of the checks – a $66,000 entry on December 31, 2008. Pedersen did not testify, however, whether this entry reflected the $66,000 the franchise owed BoConcept after payment on the $66,000 check was stopped or whether the amount reflected a new purchase order.

[183]For example, if Degla ordered $30,000 of goods, it would have made a $30,000 payment.  BoConcept would have applied that amount to the oldest unpaid invoice, reducing the franchise's debt by $30,000.  Had Degla then failed to pay the invoice for the newly ordered goods, its debt would have increased by $30,000, with the result that the outstanding balance would have been the same as it had been before the transaction occurred.

for the newly ordered goods within 30 days.  The payment terms for newly ordered goods therefore did not change and it does not appear that a failure to change the invoicing system was the cause of the increased debt.

91.   Nor did the debt increase solely because of interest charges.  The interest charges reflected on the aging report in the six months preceding December 31, 2008 were approximately $1,500 per month.   Yet the outstanding balance Degla owed BoConcept increased significantly more than such amounts.[184]  The additional amounts are reflected in columns labeled "Product Invoices Due BoConcept" and "Product Invoices Due BoConcept A/S," not in the interest columns.  Yet, as noted, any unpaid invoices during this time should not have increased the franchise's overall debt because in order to receive newly ordered goods, Degla had to make a payment equal to their value.

92.   Although the court disagrees with the Sidkys' explanation for the increase in Degla's debt following the parties' entry into the modified COD plan, it is BoConcept that bears the burden of proving reasonably calculable damages.

93.   This BoConcept failed to do.  At trial, Pedersen could not explain why Degla's debt increased after December 31, 2008 and why it did not stay the same.  In closing, counsel argued that BoConcept had not adhered to the COD plan in all instances.  There was no evidence of this, however, and Sidky testified that he could not recall any instance in which BoConcept shipped Degla product after putting the franchise on the modified COD plan in December 2008.[185]  As Degla's increased debt remains unexplained, the court concludes that the aging report is unreliable to the extent it reflects amounts owed on dates after December 31, 2008.  Any award of damages based on such amounts would be speculative.

---

[184]The outstanding balance reflected in the aging reports showed that Degla  owed $216,208.47 as of December 31, 2008.  That amount increased to $251,794.09 on January 31, 2009, $331,995.52 on February 28, 2009, $438,630.20 on March 31, 2009, $512,297.86 on May 31, 2009, $549,415.92 on June 40, 2009, $610,400.17 on July 31, 2009, $636,232.69 on August 31, 2009, $679,242.00 on September 30, 2009, $696,095.13 on October 31, 2009, all the way to $947,290.66 on August 31, 2011.

[185]Day 2 at 221:7-18.

Consequently, the court concludes that those amounts cannot be recovered.

94.   Rather, it finds that BoConcept proved an entitlement only to recover the amount owed to it on December 31, 2008: $205,083.99.[186]

95.   As noted, BoConcept also seeks to recover costs it incurred shipping product to clients that ordered merchandise through Degla following Degla's receipt of BoConcept's notice of termination. Between October 30, 2009 and April 30, 2010, BoConcept filled orders the franchise had taken after receiving a notice of termination, at a cost to it of $66,043.66.[187] Section 7(B) of the Franchise Agreement provides that BoConcept "has the right to preserve the goodwill associated with its trade name and in the event of any default, [it] reserves as the right to contact Franchisee's customers directly to complete unsatisfied orders and communicate to customers the reasons shipments are being delayed or withheld." It also states that BoConcept "may at its sole option complete certain orders directly with Franchisee's customers and where applicable collect unpaid balances upon delivering goods directly to Franchisee's customers."[188]

96.   Pedersen testified that the customers whose orders BoConcept filled had placed deposits with the franchise. He was not sure if BoConcept had received any payment from the customers for the difference between the deposit and the purchase price, or whether the customers had paid the franchise in full for the goods.[189] Since his was the only testimony in the record on this subject, BoConcept did not show by a preponderance of the evidence that it lost $66,043.66 as a result of filling these orders. Based on Pederssen's testimony, moreover, the court is unable reasonably to approximate the amount of damages

---

[186]This is the amount reflected on the aging report minus invoiced and accrued interest, as BoConcept represented that it was not seeking to recover these amounts.

[187]Day 2 at 160:12-17; Exhibit 17 (October 30, 2009-April 30, 2010 Accounts Receivable for Items Purchased at Degla's Santa Monica Store but Never Shipped ("2009-10 Accounts Receivable")).

[188]Exhibit 6 (Franchise Agreement, ¶ 7(B)).

[189]Exhibit 17 (2009-10 Accounts Receivable).

BoConcept suffered because Degla continued to take customer orders after receiving the notice of termination.

97.    For the reasons stated, the court finds that BoConcept proved the franchise – and therefore the Sidkys as guarantors under the Franchise Agreement – owes it $205,083.99.

### E.    Mitigation of Damages

98.    As noted, the Sidkys contend that they cannot be held liable for the full amount of damages sought by BoConcept because BoConcept failed to mitigate its damages. Specifically, they assert that the franchise was in arrears as early as December 2007, yet BoConcept continued to ship goods to it without receiving payment on past due invoices for a year; it was only in December 2008 that BoConcept put the franchise on a COD basis. The Sidkys argue that BoConcept should have moved to COD shipment at a much earlier date.[190]

99.    "It is a general rule of law that one injured by reason of breach of contract by another is under a duty to exercise reasonable care to avoid loss or to mitigate and minimize the resulting damage. . . .  The duty to mitigate damages is not an unlimited one and an injured party is required only to exert reasonable efforts to prevent or minimize his damages within the bounds of common sense." *Leavenworth Plaza Associates, L.P. v. L.A.G. Enterprises*, 28 Kan.App.2d 269, 271-72 (2000) (internal citations and quotation marks omitted). Thus, "[t]he determination of reasonable mitigation entails a case-by-case factual examination of the totality of the circumstances. The duty to mitigate is bounded by common sense and reasonableness." *Id*. at 272. "The aggrieved party need only take reasonable steps under the circumstances of the particular case to mitigate its damages." *Eastman Kodak Co. v. Westway Motor Freight Inc.*, 949 F.2d 317, 320 (10th Cir. 1991).

100.    "Mitigation of damages is a matter of affirmative defense and the burden of proof is upon the party who seeks to establish it." *Krehbiel v. Goering*, 179 Kan. 55, 58 (1956). "Uncertain and contingent possibilities cannot be taken into consideration in mitigation of

---

[190]Sidky Brief at 14.

1    damages." *Iseman v. Kansas Gas & Electric Co.*, 222 Kan. 644, 647 (1977).

2    101.   The Sidkys do not argue that the measures taken by BoConcept – as opposed to the timing

3           of those measures – were unreasonable, and the court affirmatively finds that they were

4           reasonable.  As noted, BoConcept first met with the Sidkys to discuss the franchise's

5           failure to make timely payments.  The Sidkys promised they would pay in a timely fashion

6           so in the future.  When that did not happen, BoConcept changed the repayment terms to

7           60 days after the invoice date and required that the franchise pay all arrearages by

8           December 2008.  When the franchise failed to make payments within 60 days, BoConcept

9           then required that it fax a copy of its check for an order before the order was shipped.

10          When checks that had been faxed were stopped due to insufficient funds, BoConcept placed

11          the franchise on a COD basis.  BoConcept's graduated efforts to control and limit the

12          amount of debt being incurred by the franchise were reasonable.

13   102.   The remaining question is whether BoConcept should have taken such steps earlier.  The

14          evidence showed that the franchise fell behind on payments within six months of opening,

15          or in approximately December 2007.  BoConcept changed the payment terms to 60 days

16          in October 2008, and placed the franchise on a COD basis in December 2008.  There was

17          thus one year between the time Degla first fell behind on payments and the time BoConcept

18          placed it on a COD payment plan.

19   103.   Aside from a generalized argument that BoConcept should have modified the payment

20          terms earlier than it did, the Sidkys do not explain how it is that BoConcept failed to

21          mitigate damages.  They do not, for example, identify a date by which BoConcept should

22          have placed them on COD.  It was not unreasonable for BoConcept to wait one year to

23          place the franchise on a modified COD payment plan because in the interim, it took other,

24          escalating steps to secure payment during that time. As the court has noted, when the

25          franchise first became delinquent, BoConcept's accounting department began to contact

26          Degla's accountant, Cabassini, frequently regarding the delinquency.  Pedersen became

27          involved after discussions between the accountants were unsuccessful and the debt had

28          grown larger.  During each of Pedersen's discussions with Sidky, Sidky assured Pedersen

that he would instruct Cabassini to transfer the amount owed to BoConcept's account.[191] Occasionally, Sidky followed through, but once BoConcept realized the debt was still growing, Pedersen and Moelholm flew to Santa Monica to discuss the matter in person with Sidky.  At that point, the parties agreed to the 60 day payment terms and after that they moved to COD.

104.   Pedersen did not identify specific dates on which BoConcept's accounting department discussed the late payments with Cabassini, or dates on which he discussed the matter with Sidky occurred.  Nor did he state how many conversations occurred or the frequency with which they occurred.  It was not BoConcept's burden, however, to prove that it adequately mitigated its damages.  Rather, it was the Sidkys' burden to show that BoConcept failed to mitigate damages.  Given Pedersen's testimony, and given the fact that Sidky repeatedly assured Pedersen the franchise would make the required payments, the Sidkys failed to show that waiting until October 2008 to place the franchise on a 60-day payment plan and waiting an additional two months to place it on a COD payment plan was unreasonable.  See *Steele v. J.I. Case Co.*, 197 Kan. 554, 565 (1966) (affirming a jury verdict that a buyer did not fail to mitigate damages by relying on the seller's assurances that machinery would conform to the warranty); *Winfrey v. Galena Automobile Co.*, 113 Kan. 343, 343 (1923) ("If [ ] a contract has been practically broken, the fact that the other party has from time to time made promises leading to a belief that it would be fulfilled will authorize a full recovery, although plaintiff, relying on such promises, may have taken no action ot prevent the injury").

105.   Accordingly, the Sidkys failed to carry their burden of proof on their defense that BoConcept did not mitigate its damages.

## F.   BoConcept's Request for a Permanent Injunction

106.   "To obtain injunctive relief, the movant must show: (1) there is a reasonable probability of irreparable future injury to the movant; (2) an action at law will not provide an adequate

---

[191]Day 1 at 107:15-20.

42

remedy; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest." *Board of County Commissioners of Reno County v. Asset Management and Marketing L.L.C.*, 28 Kan.App.2d 501, 506 (2001).

107.  "Injunctions apply to future events rather than to past or completed acts." *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 242 (1990).  "Mere apprehension or possibility of wrong or injury ordinarily does not establish a reasonable probability of future injury that will justify injunctive relief.  To obtain injunctive relief, it must clearly appear that some act has been done, or is threatened, which will produce irreparable injury." *Sampel v. Balbernie*, 20 Kan.App.2d 527, 531 (1995).

108.  BoConcept's prayer for a permanent injunction is based on an allegation that Section 7(E) of the Franchise Agreement requires the franchisee, upon termination of the franchise agreement" to "forthwith discontinue use of [ ] [BoConcept's trademarks] . . ., signs, colors, structures, interior and exterior decor, business methods, confidential information, printed goods and forms of advertising indicative of the Franchise Business and return all materials and the Software Program to the Company."[192]  BoConcept contends that despite receiving the notice of termination, Degla continues to market and take orders and deposits for furniture and accessories using BoConcept's trademarks, signs, colors, structures, interior and exterior decor, business methods, confidential information, printed goods and forms of advertising.[193]

109.  BoConcept adduced no evidence at trial that Degla continues to market and take orders and deposits for BoConcept furniture or that it continues to have access to any of BoConcept's signs, colors, structures, interior and exterior decor, business methods, confidential information, printed goods or forms of advertising.  All of the available evidence indicates that it has long since ceased taking orders and that it no longer has access to the proprietary

---

[192]FAC, ¶ 30.

[193]*Id.*, ¶ 31.

43

aspects of BoConcept's business.  Any threatened injury is therefore entirely speculative and not sufficient to support entry of a permanent injunction.  See *State ex rel. Stephan v. Pepsi-Cola General Bottlers, Inc.*, 232 Kan. 843, 844-45 (1983) (noting that an injunction would be inappropriate where "Pepsi-Cola has, at least for the present, ceased the complained-of activity, [such that] the State is now asking for prospective injunctive relief.  No evidence has been offered to show a reasonable probability Pepsi will conduct the same type of promotion in the future").  Accordingly, the court concludes that BoConcept did not prove an entitlement to a permanent injunction.

### G.    The Fraud Claim

110.    BoConcept seeks to recover the same damages on its fraud claim as it does on its breach of contract claim; it does not seek punitive damages or any other form of relief on the fraud claim.[194]  Recovering the same damages for fraud that the court has already awarded for breach of contract would be duplicative.  See *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 516 (1988) ("The jury found Moore had breached its promise under the contract that it would take back the system if Abbick could not use it, and awarded actual damages of $1,185.00. . . .  An award of actual damages on the fraud claim would have been duplicative and was properly not submitted to the jury"); see also *Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442, 1459 (10th Cir. 1997) ("It is well established that 'double recovery is precluded when alternative theories seeking the same relief are pled and tried together,'" quoting *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979)), overruled on other grounds by *TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011).

111.    The court therefore need not consider BoConcept's fraud claim.[195]

---

[194]BoConcept Brief at 12 ("The damages sought for the fraudulent conduct are the same as those sought for the breach of contract – the amounts owed on the account").

[195]Had the court not found that the Sidkys intended to sign the Acknowledgment section of the Franchise Agreement by printing their names, it would have found that the evidence adduced at trial showed that the Sidkys had fraudulently induced BoConcept to enter into the Franchise

112.   Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

### III.   CONCLUSION

For the reasons stated, the court finds that BoConcept prevailed on its breach of contract claim, and awards $205,083.99 in damages against the Sidkys.  The court denies BoConcept's request for a permanent injunction.  It dismisses the fraud claim as duplicative.

DATED: August 8, 2014

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

Agreement with Degla; and that they printed their names in the Acknowledgment section of the contract instead of signing to deceive BoConcept, cause it to believe that they had agreed to guarantee the franchise's obligations personally, and induce it to enter into the agreement with them.  The court would also find that, given the evidence the court noted above – concerning the parties' discussions about Section 5(Q), the Sidkys' understanding that BoConcept required that they either execute personal guarantees or provide a bank guarantee, and their failure to notify BoConcept that their printed names were not intended to be their signatures – BoConcept reasonably believed the Sidkys' printed names in the Acknowledgment section served as an agreement personally to guarantee the franchise's debts, and justifiably relied on the guarantees in deciding to enter into the agreement.  As a consequence, it suffered $205,083.99 in damages when the franchise failed to pay invoices through December 2008.  See *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996) (holding that a claim for fraudulent inducement lies "where a defendant fraudulently induces a plaintiff to enter into a contract"); *Croeni v. Goldstein*, 21 Cal.App.4th 754, 758 (1994) (noting that to plead a fraud claim adequately, a party must allege (1) a knowingly false representation or fraudulent omission by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages).